**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION**

ERCIL K. GATES,
ADC #143759                                                          PLAINTIFF

V.                              2:10CV00077 DPM/JTR

CHARLENE BOGAN, Sergeant,
East Arkansas Regional Unit, et al.                          DEFENDANTS

**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

**INSTRUCTIONS**

The following recommended disposition has been sent to United States District

Judge D.P. Marshall Jr.  Any party may serve and file written objections to this

recommendation.  Objections should be specific and should include the factual or

legal basis for the objection.  If the objection is to a factual finding, specifically

identify that finding and the evidence that supports your objection.  An original and

one copy of your objections must be received in the office of the United States District

Clerk no later than fourteen (14) days from the date of the findings and

recommendations.  The copy will be furnished to the opposing party.  Failure to file

timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new,

different, or additional evidence, and to have a hearing for this purpose before the

United States District Judge, you must, at the same time that you file your written

objections, include a "Statement of Necessity" that sets forth the following:

1.  Why the record made before the Magistrate Judge is inadequate.

2.  Why the evidence to be proffered at the requested hearing before the United States District Judge was not offered at the hearing before the Magistrate Judge.

3.  An offer of proof setting forth the details of any testimony or other evidence (including copies of any documents) desired to be introduced at the requested hearing before the United States District Judge.

From this submission, the United States District Judge will determine the necessity

for an additional evidentiary hearing, either before the Magistrate Judge or before the

District Judge.

Mail your objections and "Statement of Necessity" to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Suite A149
Little Rock, AR 72201-3325

## I.  Introduction

In May of 2009, Plaintiff, Ercil K. Gates, began a period of incarceration at the

East Arkansas Regional Unit ("EARU").   In late August, he was assigned to work in

the kitchen, where water on the floor regularly saturated his worn out leather boots

and caused his feet to become wet. He believes his inadequate footwear led to a severe case of athlete's foot.

In this § 1983 action, he asserts an unconstitutional conditions of confinement claim against Defendants James Bell, the Food Services Supervisor at the EARU; Charlene Bogan, the Laundry Issuance Supervisor, who was responsible for issuing prisoners footwear; and Sergeant Loretha Bell, who investigated one or more of Plaintiff's grievances about his inadequate footwear.[1] *See* docket entries #2, #3, and #4.

Defendants have filed a Second Summary Judgment, a Brief in Support, and a Statement of Undisputed Facts. *See* docket entries #123, #124, and #125. Plaintiff, who is represented by appointed counsel, has filed a Response. *See* docket entry #132.

The relevant facts, viewed in a light most favorable to Plaintiff, are as follows:[2]

---

[1] The Court has previously dismissed all other Defendants and claims raised in Plaintiff's Complaint. *See* docket entries #7, #9, #108, #110, #112, and #114.

[2] Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 249-50 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex,* 477 U.S. at 323. Thereafter, the nonmoving party must present specific facts demonstrating that there is a material dispute for trial. *See* Fed R. Civ. P. 56(c);

1.      On May 21, 2009, Plaintiff arrived at the EARU.  Defendant Bogan gave him a used pair of leather boots.  *See* docket entry #123, Ex. A.  Plaintiff was then assigned to the hoe squad.  *Id.*

2.      In late August of 2009, Plaintiff was reassigned to work in the EARU kitchen under the supervision of Defendant James Bell.  *Id.*  Water from the kitchen floor seeped through the torn seams in Plaintiff's leather boots causing his feet to become wet.[3] *Id.*

3.      In early February of 2010, Plaintiff filed four Informal Resolutions, the first step in the ADC grievance process.  *Id.* In those forms, Plaintiff asked Defendant Bogan to provide him with replacement boots that would keep his feet dry.[4]  *Id.* Defendant Bogan did not respond to any of those Informal Resolutions.  *Id.*

4.      During this time period, Plaintiff also verbally complained to Defendant James Bell about his need for replacement boots.  *Id.*  He also showed Defendant Bell his feet.  *Id.* Defendant Bell stated that Plaintiff would have to resolve his footwear

---

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).

[3] Plaintiff performed several other jobs while assigned to the EARU.  He claims that his feet remained wet while performing all of those jobs.  *See Id.,* Ex. A.

[4] Plaintiff later filed additional Informal Resolutions and Grievances regarding the condition of his feet and his perceived need for protective footwear.  *See* docket entry #123, Ex. A.  Defendant Sergeant Loretha Bell investigated one or more of those grievances.  *Id.,* Exs. A and E.

issue with Defendant Bogan, and that he should seek medical treatment for his feet in the prison infirmary.  *Id.*

5.      Consistent with Defendant Bell's recommendation, on February 10, 2010, Plaintiff went to the EARU infirmary, where he was diagnosed with athlete's foot.  The medical staff prescribed Tolnaftate cream.  *Id., Ex. C.*

6.      On March 1, 2010, Plaintiff returned to the infirmary for treatment of his athlete's foot, which had spread and began to drain fluid.  *Id.,* Ex. A and C.  He was prescribed Ketoconazole cream.  *Id.*

7.      On March 4, 2010, Plaintiff met with Defendant Bogan about getting replacement boots. *Id.*, Ex. A.  Plaintiff showed Defendant Bogan the condition of his feet and his worn leather boots.  *Id.*  Defendant Bogan told Plaintiff he might need rubber boots and suggested that he talk to Defendant Bell, his supervisor, about the matter.  *Id.*  Defendant Bogan also advised Plaintiff to continue to seek medical treatment for his athlete's foot in the infirmary.  *Id.*

8.      On March 6, 2010, Plaintiff returned to the infirmary. *Id.,* Exs. A and C. Medical providers noted that Plaintiff had severe athlete's foot and a secondary bacterial infection.  *Id.*, Ex. C.  They prescribed Ketoconazole cream, Cephalexin oral antibiotics, and daily wound care.  *Id.*  Additionally, they issued Plaintiff a fourteen

day work pass, which relieved him of working in the kitchen.[5]  *Id.*

9.      Importantly, at no point in the treatment of Plaintiff's athlete's foot did any of the medical personnel ever issued Plaintiff a script for rubber boots or any other replacement footwear.  Similarly, nothing in the notes of the medical personnel suggest that they believed his allegedly worn out leather boots contributed to his athlete's foot or needed to be replaced in order to alleviate that condition.

10.     On March 6 and 9, 2010, Plaintiff again met with Defendant Bogan.  *Id., Ex. A.*  During both meetings, she offered Plaintiff replacement leather boots.  *Id.*  The parties disagree on the condition of those boots and whether they would have kept Plaintiff's feet dry.  *Id.*  Because Plaintiff believed he should be provided *with new leather boots*, he rejected the used boots offered by Defendant Bogan.[6]

11.     On March 11, 2010, Plaintiff returned to the infirmary.  *Id., Ex. C.*

---

[5]  After receiving his work pass, Plaintiff never returned to work in the EARU kitchen.  Since he filed his first Informal Resolution seeking new boots to keep his feet dry in early February, the relevant time period during which Plaintiff was allegedly exposed to unconstitutional conditions of confinement was about four weeks (early February to March 6, 2011).

[6] This would seem to call into serious question whether Plaintiff really believed that his allegedly worn out boots, with torn seams, were the cause of his athlete's foot.  Surely, if he did, he would have accepted the offered boots, which while not new, presumably were in better shape than the boots he was wearing.

Medical providers noted that his athlete's foot had worsened.[6]  *Id.*   Plaintiff was

admitted into the prison infirmary for twelve days, where he received daily Epsom salt

soaks, Betadine cleansing, Ketoconazole antifungal tablets, and Clindamycin

antibiotics. *Id.*

12.     On March 23, 2010, Plaintiff was discharged from the infirmary and

given a ten day work pass.  *Id.*

13.     On March 29, 2010, Plaintiff was transferred to the Wrightsville Unit,

where he alleges that he received new leather boots.  *Id.*

## II.  Discussion

To prevail on his Eighth Amendment conditions of confinement claim, Plaintiff

must prove that:  (1) objectively, a substantial risk to his health or safety existed; and

(2) subjectively, the defendants were deliberately indifferent to that substantial risk

of harm.  *See Davis v. Oregon County, Mo.*, 607 F.3d 543, 548-49 (8th Cir. 2010);

*Ambrose v. Young,* 474 F.3d 1070, 1076-77 (8th Cir. 2007); *Revels v. Vincenz*, 382

F.3d 870, 875 (8th Cir. 2004). As to the second element, the Eighth Circuit has

---

[6]  On March 6, 2010, Plaintiff received a work pass that relieved him from working.  Thus, when he returned to the infirmary on March 11, he had not been doing *any work* for six days, and, presumably, his feet had remained dry.  Nonetheless, his athlete's foot had *still worsened*. This would seem to seriously undermine Plaintiff's subjective opinion, as a lay person, that the water on the kitchen floor, coupled with his worn boots, caused his athlete's foot and resulted in his condition worsening.

clarified that negligence is not enough, and instead, the defendant "must recklessly disregard a known" risk of substantial harm. *Davis,* 607 F.3d at 549.

Each of the three remaining Defendants argue that they are entitled to judgment, as a matter of law, because there is *no evidence* suggesting that they were deliberately indifferent to a substantial risk of harm to Plaintiff arising from his athlete's foot.[7] *See* docket entries #124 and #125.  The Court will address each Defendant's argument separately.

## A.   Defendant Charlene Bogan

It is undisputed that Plaintiff regularly received medical treatment for his athlete's foot during the time he alleges that Defendant Bogan failed to provide him with new boots.  Importantly, *no medical personnel* ever issued Plaintiff a script for new boots or otherwise suggested that his working conditions were the cause of his

---

[7] Athlete's foot is a ubiquitous condition that afflicts anyone who has moisture between his toes. According to the Mayo Clinic website, athlete's foot is "a fungal infection that develops in the moist areas between your toes and sometimes other parts of the foot. [It] usually causes itching, stinging, and burning. . . . Although contagious, athlete's foot often can be treated with over-the-counter antifungal medications." *See www.mayoclinic.com/health/athletes-foot/DS00317.*

Within a few days of first complaining to Defendants Bell and Bogan about his feet, Plaintiff began receiving regular treatment from medical personnel in the EARU infirmary.  He was prescribed a host of medications to remedy the problem.  All of the Defendants were aware that Plaintiff was receiving this medical treatment.  Given the ongoing treatment Plaintiff was receiving for his athlete's foot, it seems unlikely that it ever posed a "substantial risk of harm" to him.

athlete's foot.

As the name itself suggests, *athlete's* foot is normally caused when perspiration (which athletes produce in copious amounts) keeps toes moist for extended periods of time. While Plaintiff *subjectively believes* that his athlete's foot was caused by his worn out leather boots, which allowed water on the kitchen floor to reach his feet and toes, no medical evidence supports his opinion. Certainly, to the extent that none of the infirmary personnel issued Plaintiff a script for new boots, or a job reassignment, they did not share Plaintiff's view that his athlete's foot was caused by his allegedly inadequate footwear.

Suffice it to say, there is *no evidence* that Plaintiff's four Informal Resolutions sent to Defendant Bogan in February, complaining about his wet feet and need for new boots, were sufficient to place her on notice that Plaintiff's athlete's foot, a problem for which she knew he was receiving treatment in the infirmary, created a "substantial risk of harm" to him.

More importantly, on the occasion that Plaintiff spoke with Defendant Bogan about his athlete's foot, she suggested that he continue to seek medical treatment to take care of the problem. While Defendant Bogan appears to have disagreed with Plaintiff's subjective opinion that his worn leather boots had caused his athlete's foot, there is *no evidence* that "subjectively" she was ever "deliberately indifferent to a

substantial risk of harm" to Plaintiff from that problem.

Finally, on March 4, 2010, Plaintiff alleges that he showed Defendant Bogan his athlete's foot.  At that point, Plaintiff had made at least two visits to the infirmary and had been prescribed two different topical creams for his problem.  Defendant Bogan is not a doctor or nurse.  She was in no position to evaluate the seriousness of Plaintiff's athlete's foot, but she did know that medical personnel in the infirmary were treating the problem.   Rather than being deliberately indifferent to Plaintiff's situation, she recommended that he see Defendant Bell about getting rubber boots.[8]

On March 6, 2010, Plaintiff returned to the infirmary where he received more topical creams, antibiotics, and a fourteen day work pass.  In meeting with Plaintiff, on March 6 and 9, 2010, Defendant Bogan offered Plaintiff replacement boots, a gesture that again makes it clear that Defendant Bogan was *not* being "deliberately indifferent" to Plaintiff's problem with athlete's foot.  Plaintiff's refusal to accept those boots, because they were not in a new condition, raises serious questions about whether he truly believed his problem with athlete's foot was caused by his boots.

Finally, on March 6, the infirmary issued Plaintiff a pass that relieved him of

---

[8] Rubber boots would have kept water on the kitchen floor from coming in contact with Plaintiff's feet. However, they also would have insured that Plaintiff's feet and toes remained moist and wet from trapped sweat.  Thus, rubber boots may have worsened Plaintiff's athlete's foot.

performing any work until his athlete's foot cleared up.  This mooted Plaintiff's ongoing dispute with Defendant Bogan over the condition of the offered replacement boots.

Based on the undisputed material facts, there is simply no evidence that Defendant Bogan was ever "deliberately indifferent to a substantial risk of harm" to Plaintiff arising from his problem with athlete's foot.  Accordingly, Defendant Bogan is entitled to judgment, as a matter of law, on Plaintiff's conditions of confinement claim.

## B.    Defendant James Bell

Plaintiff contends that Defendant James Bell was deliberately indifferent to a substantial risk of harm to Plaintiff when he refused to provide him with replacement boots or have him reassigned to  a job outside of the EARU kitchen.

For the same reasons discussed in analyzing Plaintiff's conditions of confinement claim against Defendant Bogan, there is simply *no evidence* that Defendant Bell was ever "deliberately indifferent to a substantial risk of harm" to Plaintiff arising from his problem with athlete's foot.  While Plaintiff seems to suggest that Defendant Bell should have issued him rubber boots, none of the medical personnel treating Plaintiff's athlete's foot ever issued a script directing that he receive rubber boots or any other type of replacement boots to help his problem with athlete's

foot.

Finally, when Plaintiff complained about his feet getting wet in the kitchen, Defendant Bell attempted to remedy the situation by reassigning Plaintiff to a different job in the EARU kitchen.  While the parties dispute whether Plaintiff's feet stayed dry in that new position, Defendant Bell's attempt to resolve the problem demonstrates that he was not deliberately indifferent to Plaintiff's perceived need to keep his feet dry.[9]

There is simply *no evidence* that Defendant Bell was aware that Plaintiff's athlete's foot, for which he was receiving medical treatment, was creating a "substantial risk of harm."  Similarly, there is *no evidence* that Defendant Bell was deliberately indifferent to a "substantial risk" of harm to Plaintiff arising from his athlete's foot.  Accordingly, as a matter of law, Defendant Bell is also entitled to summary judgment.

## C.     Defendant Loretha Bell

Finally, Plaintiff contends that Defendant Loretha Bell was deliberately indifferent, on or about February 27 and March 8,  when she improperly investigated

---

[9]  Neither party knows exactly when Plaintiff complained to Defendant Bell about his need for replacement boots and athlete's foot.  *See* James Bell Declaration (docket entry #123, Ex. F); *see also* Plaintiff's Deposition (docket entry #123, Ex. A). However, the parties agree that it was sometime *before* March 6, the date infirmary medical staff granted Plaintiff a fourteen day work pass.  *Id.*

two of his Informal Resolutions seeking replacement boots.[10]  It is undisputed that, during her investigations, Defendant Loretha Bell spoke to both Defendants Bogan and Defendant James Bell about the matter.[11]  It is also undisputed that she verified Plaintiff was receiving ongoing medical treatment for his athlete's foot in the infirmary.

Importantly, on February 27 and March 8, Plaintiff did *not* have a medical script directing that he receive replacement boots or that he be reassigned to a job outside of the kitchen.  Further, in her Declaration, Defendant Loretha Bell explains that, as an informal problem solver, she did *not* have the authority to issue Plaintiff replacement boots or reassign him to a different job.  *See* docket entry #123, Ex. E. Although he has been given the opportunity to do so, Plaintiff has not come forward with *any* evidence to refute those assertions.

---

[10]   It is unclear how many Informal Resolutions Defendant Loretha Bell investigated and when those investigations occurred. *Compare* Loretha Bell Declaration (docket entry #123, Ex. E) (stating that she investigated one of Plaintiff's Informal Resolutions, on an *unspecified* date), *with* Plaintiff's Deposition and Grievances (docket entries #123, Exs. A, A-3, and A-6) (stating that Defendant Loretha Bell investigated one Informal Resolutions on or about February 27 and a second Informal Resolution on or about March 8). The Court will construe this factual dispute in the light most favorable to Plaintiff.

[11]   According to Defendant Loretha Bell's Declaration, Defendant Bogan said she had already offered replacement boots to Plaintiff.  *See* docket entry #123, Ex. E. Additionally, Defendant James Bell said that he would speak to Plaintiff about the matter.  *Id.*

In sum, Plaintiff's argument is that Defendant Loretha Bell should have done more to help him when she investigated his Informal Resolutions.  As previously explained, a § 1983 claim cannot be based on negligence.  Instead, a plaintiff must present evidence that a defendant "recklessly disregarded a known" risk of substantial harm.  *Davis,* 607 F.3d at 549.  Plaintiff has failed to come forward with any such evidence against Defendant Loretha Bell.  Accordingly, as a matter of law, she is entitled to summary judgment.

### III.  Conclusion

IT IS THEREFORE RECOMMENDED THAT:

1.     Defendants' Second Motion for Summary Judgment (docket entry #123) be GRANTED, and that this case be DISMISSED, WITH PREJUDICE.

2.     The Court CERTIFY, pursuant to 28 U.S.C. § 1915(a)(3), that an *in forma pauperis* appeal from any Order adopting this Recommended Disposition would not be taken in good faith.

Dated this 13th day of April, 2012.

_____
UNITED STATES MAGISTRATE JUDGE